The HOOPA VALLEY TRIBE,
Plaintiff-Appellee,

v.

Joe CHRISTIE, et al.,
Defendants-Appellants.

No. 86–2861.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 21, 1986.

Decided Dec. 4, 1986.

Amended March 13, 1987.

**1098**

Sarah P. Robinson, Land & Natural Resources Div., Washington, D.C., for defendants-appellants.

Pirtle, Morisset, Schlosser & Ayer, Thomas P. Schlosser, Seattle, Wash., for plaintiff-appellee.

Before SNEED, KENNEDY and NOONAN, Circuit Judges.

## AMENDED OPINION

NOONAN, Circuit Judge:

The Hoopa Valley Tribe (the Hupas) sought an order enjoining Joe Christie and other officers of the Bureau of Indian Affairs (the Bureau) from transferring the Bureau's office, staff and equipment from the Hoopa Valley Reservation to Redding, California. Jurisdiction existed under 28 U.S.C. §§ 1331, 1361, and 1362. The district court on November 7, 1986 granted a preliminary injunction against the transfer.

On November 13, 1986 the federal defendants filed a timely notice of appeal. On November 21 this court issued a stay of the district court's order with a statement that an opinion would be filed in due course.

On November 24, 1986 the Hupas made a motion in the district court to amend or make additional findings of fact pursuant to Fed.R.Civ.P. 52(b) and 59(e). This motion could not, of course, deprive our court of jurisdiction that it had already exercised on November 21, 1986. Fed.R.App.P. 4(a)(4) is not applicable as to this exercised jurisdiction. The stay of November 21, 1986, and the opinion explanatory thereof, establish the law of the case.

*Background.* The Hupas have existed for centuries in northern California. B. Nelson, *Our Home Forever. A Hupa Tribal History* (1978) 3. In addition to the Hupas there have been a great variety of other Indian tribes in northern California. S. Cook, *The Population of the California Indians 1769–1970* (1976) 16. Among them the Hupas stood out, in the view of an early ethnologist, as "the Romans of Northern California in their valor and their wide-reaching dominions." S. Powers, *Tribes of California* (1877) 72. In 1864 a reservation was created by Congress in the Hoopa Valley on the lower part of the Trinity River in northwestern California. This reservation is the abode of the Hupas. Nelson, *Our Home Forever* 90. The reservation is characterized by its identity with the ancestral homelands of the Hupas, by its exceptional size, and by its relative prosperity from timber and concessions. J.

Rawls, *Indians of California* (1984) 211, 213.

The statute creating the reservation was enacted April 8, 1864. It authorized the President to appoint "an Indian agent" for each reservation authorized by the statute and directed that such agent "shall reside upon the reservation for which he shall be appointed, and shall discharge all the duties now or hereafter to be required of Indian agents by law, or by rules and regulations adopted, or to be adopted, for the regulation of the Indian service, so far as the same may be applicable." 13 Stat. 40–41. The statute also authorized the appointment of one physician, one blacksmith, one assistant blacksmith, one farmer and one carpenter. Austin Wiley, editor of the *Humboldt Times* and advocate of deporting hostile Indians to Santa Catalina Island, became Superintendent of Indian Affairs for California in the same year. Rawls, 169. After sporadic fighting in which some Hupas were involved and negotiations were entered into, on August 16, 1864 Wiley signed a document entitled *"Treaty of Peace and Friendship"*. Wiley acted on behalf of the United States. The tribes agreeing to the document were the Hupas and the South Fork, Redwood, and Grouse Creek Indians. The government promised to maintain an agent on the reservation and enough employees "to instruct the Indians in farming and harvesting." The tribes promised to "obey all orders emanating from the agent in charge." *Annual Report of the Commissioner of Indian Affairs* (1864) 134–136. This treaty was never ratified as a treaty by the United States nor enacted as a statute by Congress. An executive order designating the land that was to constitute the reservation was issued by the President on June 23, 1876. The boundaries of the reservation were extended by executive order on October 16, 1891, were curtailed by executive order March 2, 1909, and were restored by executive order February 17, 1912. Nelson, *Our Home Forever* 189–192.

Various arrangements have been made by which Indian reservations in California have been administered. For example, in the 1870's the United States put them in charge of persons nominated by the Methodist Episcopal Church. Rawls, p. 158. The jurisdiction of the different agencies has also varied, not always in accordance with the dictates of geography. For example, since 1972 the Central California Agency, located in Sacramento, has dealt with Indians almost as far south as Palm Springs and as far north as the northwestern section of the state; the previously much-broader coverage of the agency at Hoopa Valley has been restricted to the six northwestern counties. California Indian Task Force, *Report* (1984) 11 (hereafter *Report* ).

The Indian population of California has grown remarkably in recent years. In 1840 it has been estimated to have been about 300,000. Cook, p. 43. By 1900 it was as low as 15,000. *Id.* 53. By 1970 it had rebounded to 91,000. *Id.* Improved health and substantial immigration from other states led to a doubling of the 1970 population by 1980, making it the largest Indian population in the nation. Rawls, 211, 214.

Not all of the Indians who have entered California are entitled to federal services but many of them seek information from the Bureau. *Report,* p. 12. They seek it at offices that are accessible. The burdens of the Central California Agency have greatly increased. In 1984 a task force was formed by the United States to study ways of improving service to the Indians of California. This "California Indian Task Force" was chaired by Maurice H. Babby, the Sacramento Area Director of the Bureau. Its members were five representatives of the Bureau; a representative of the Indian Public Health Service; a representative of the Regional Solicitor's Office of the Department of the Interior; and eleven tribal leaders, representing eleven separate Indian groups in California, including the Hupas. Hearings were held in Sacramento, San Diego, and Arcata. At the Arcata hearing on July 10, 1984 the Task Force heard from Dale Risling "representing the Tribal Chairperson, Elsie Ricklefs" of the Hupas; from Danny Jordan, of

the governing body of the Hupas, the Hoopa Valley Business Council; and from Marcelene Norton, identified as belonging to the Tribal Education Department of the Hupas. *Report*, 159–162.

The Task Force, which had been formed in March 1984, filed its recommendations with the Assistant Secretary of the Interior—Indian Affairs in October 1984. The *Report* was critical of past efforts of the federal government on behalf of the Indians and emphatic in asking for more money and better organization of these efforts. The degree of unanimity as to the recommendations is not clear. It was stated in oral argument that Superintendent Babby was the principal draftsman, as might be expected of the chairman. It is at any rate evident that the recommendations were not made without listening to Indian representatives including representatives of the Hupas.

Among the many recommendations in the 162 pages of the *Report* was that a high priority be assigned the Bureau's exercise of trust responsibility to the Indians of California. A statement on "Trust Responsibility" declared "The Bureau of Indian Affairs should exercise trust responsibility to all Indian tribes." *Report*, 14. "Already limited Bureau funding and services," it was critically observed, focus on "the landed few" and ignore "most of the Indians of California whose needs are as great or greater." *Report*, 33; cf. *id.* 12. Specifically it was recommended, "That the Secretary affirm that trust responsibility exists for California tribes, bands, or groups." *Report*, 14.

Among the detailed recommendations related to this theme were these: "Agency office locations must be increased or relocated to improve 'outreach' capability to California tribal groups." *Report*, p. 7. The Central California Agency was found to be overextended in attempting to cover the vast area assigned it. *Report*, 148. A discussion of "bureau staffing needs" recommended that the northeast corner of the state be reassigned to the Northern California Agency. *Report*, 153. The Report emphasized that "relocation of the existing

Northern California Agency office to a location more accessible by all groups within the jurisdiction is absolutely essential." *Id.*

The Department of the Interior did not take the Task Force Report as a blueprint for action in every respect, and in argument something was made of the difference between what the *Report* recommended and what the department did. But as to the transfer in dispute in this case it is clear that its basis was laid in the analysis and recommendations made in the *Report*.

In December 1985, over a year after the *Report* was filed, Ross O. Swimmer, Assistant Secretary of Interior—Indian Affairs, met in Washington with representatives of the Hoopa Valley Business Council and told them of a pending reorganization of the Northern California Agency which involved the transfer of the agency from Hoopa Valley to Redding. The Hoopa Valley Business Council by resolution adopted January 30, 1986 opposed the proposal. The Secretary of the Interior on June 5, 1986 approved the addition of reservations and rancherias in Modoc and Lassen counties to the Northern California Agency; the relocation of the primary office of the Agency from the Hoopa Valley Reservation to Redding; and the establishment of field offices in Klamath and Willow Creek. The Secretary acted under the authority conferred upon the President to increase economy and efficiency by reorganizing the executive branch, 5 U.S.C. § 901. After meeting with Northern California tribal leaders at Arcata on June 11, 1986, Assistant Secretary Swimmer decided that one of the two field offices would not be at Willow Creek but at the Hoopa Valley Reservation. According to statements made by counsel, almost 10,000 Indians will be served by the reorganized Northern California Agency, 4,000 of them on the Hoopa Valley Reservation.

The move from Hoopa Valley to Redding leaves 25 Agency positions at Hoopa Valley and moves 22 employees to Redding. Those employees of the Bureau who are Hupas and whose positions are moved to

Redding will be forced to choose between leaving the reservation and losing their jobs. In the case of married employees, this choice will affect educational opportunities for their children and will force employed husbands or wives to seek new employment or live at a distance from their spouses. The employees moving will lose the tax-exempt status they enjoy on the reservation. The loss of Bureau spending at Hoopa Valley will have an unfavorable economic impact on the businesses and community activities of the reservation.

On September 29, 1986 the Hupas filed suit in federal court seeking both an injunction against the transfer and declaratory relief. The complaint alleged that the transfer "flies in the face of a solemn agreement between plaintiffs and defendants that obligated defendants to maintain the Agency on this Reservation." The transfer was said to be retaliation against the Hoopa Valley Business Council for whistle-blowing on July 27, 1984 to the Inspector General of the Department of the Interior and also to be based upon "trumped-up BIA claims of drug cultivation and other illegal activities on the Reservation." The specific legal claims made by the Hupas were first, a violation of "the agreement" of August 6, 1864; second, a taking without due process of law of the Hupas' "entitlement to the employment opportunities, program benefits, and general economic support" provided by the agency; third, a violation of the National Environment Policy Act because of the Bureau's failure to analyze the environmental impact of the move; fourth, violation of the First Amendment because the transfer was in retaliation for the Hupas' whistle-blowing and because the transfer was "for the express purpose of impeding the First Amendment associational activities of the Tribe and its members"; fifth, a reprogramming of funds available for services to the Hupas in order to pay for the move, a reprogramming asserted to be "in violation of the goals of the Indian Self-Determination Act, 25 U.S.C. § 450"; sixth, a withholding of pertinent documents in violation of the Freedom of Information Act, 5 U.S.C. § 552; seventh, a breach of trust owed the Hupas; and eighth and last, a violation of the Administrative Procedure Act.

On November 7, 1986 the district court issued a preliminary injunction against the transfer. The court found no violation of the National Environmental Policy Act. The court did not discuss the First Amendment claims. The court treated the unratified Treaty of August 6, 1864 as binding. It observed that Congress may "abrogate treaty promises" only by a clear expression of intent and concluded, "Therefore, the 1864 agreement is binding and may be enforced" but only to the extent that the agreement provided for instructors in farming and harvesting. The court found there was insufficient evidence that this provision was being violated.

The court, however, did conclude that the benefits the Hupas had been receiving had risen "to the level of property rights," protected by the Fifth Amendment. The court ruled that the transfer could not proceed until there was a full dress hearing for the Hupas before an impartial decision-maker under the standards set out in *Goldberg v. Kelly*, 397 U.S. 254, 266–70, 90 S.Ct. 1011, 1019–21, 25 L.Ed.2d 287 (1969).

The court had begun its analysis by saying that the plaintiff's request for a preliminary injunction was "based on the first three claims"; but the court on its own held that the Bureau had a duty to consult with the tribe—a duty based on the government's fiduciary responsibility to the Indians and on its own regulations. The court cited *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 718 (8th Cir.1979). The court held that the Bureau's failure to conform to its regulations had made the Bureau's actions " 'arbitrary and capricious' within the meaning of 5 U.S.C. § 706" and invoked *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). Finding that the balance of hardships tipped strongly in favor of the Hupas; that irreparable harm would result unless the Bureau officials were enjoined; that the Hupas had no adequate remedy at law; and that the Hupas had established "a probable likelihood of suc-

cess" on their due process claim and "a likelihood of success" on their trust and Administrative Procedure Act claims, the court issued its order. The order blocked the transfer and required within 10 days the retransfer from Redding to Hoopa Valley of the equipment already moved.

■ *Analysis.* To be entitled to a preliminary injunction the moving party must demonstrate the probability of success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). If the district court based its decision on erroneous legal premises in granting a preliminary injunction, it must be reversed. *Id.* at 1200. Such is the case here.

We have no quarrel with the district court's finding that the balance of hardship tips sharply in the Tribe's favor. The Hoopa Valley Reservation will suffer economic loss. Individual Hupas will face harsh choices. Inconvenience and expense and frustration suffered by the Bureau do not appear to outweigh the effect of the dislocations upon the tribe. The Hupas will hurt more. The difficulty with the preliminary injunction is its premises.

■ The agreement of 1864 on which the Hupas rested their first claim, and which the district court found to be binding on the United States, was drafted as a treaty. It was never ratified by the Senate and consequently has no validity as a treaty. Constitution of the United States, Art. II, § 2. Some contracts have indeed been made between the United States and Indian tribes and have acquired binding force by congressional action. F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) 127; W. Canby, *American Indian Law* (1981) 258. These agreements acquire their strength by statute. *Antoine v. Washington,* 420 U.S. 194, 203–04, 95 S.Ct. 944, 950, 43 L.Ed.2d 129 (1975). No statute has converted Austin Wiley's agreement into law. In passing it may be doubted that any of the parties has kept, or would care to keep, all of the terms of an agreement tailored to life in 1864.

■ The Hupas possess no property taken by the transfer. The Hupas do not possess a property right in the presence of the principal office of the Northern California Indian Agency. The statute of 1864 did not create such a right. The unratified Treaty of 1864 did not create such a right. The practice of the Bureau did not create such a right. An entitlement which rises to the level of property rights is "an individual entitlement." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). Property in this sense consists in "interests that a person has already acquired in specific benefits." *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1971). Expectations of employment or economic benefits to the community in general are not property within the meaning of the Fifth Amendment. As there is no property at issue, there is no issue of due process.

■ Qualified Indians do have a preference for appointment to vacancies in the administration of services or functions affecting Indians. 25 U.S. § 472. The preference is granted to Indians "as members of quasi-sovereign tribal entities." *Morton v. Mancari,* 417 U.S. 535, 554, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290 (1974). The purpose of the preference was "to increase the participation of tribal Indians in the BIA operations." *Id.* at 543, 94 S.Ct. at 2479. The statute did not create proprietary rights to their jobs in the Indian employees.

■ The Bureau as the agent of the United States does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to all Indian tribes. See *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 378–79 (1st Cir.1975). No trust relation exists which can be discharged to the plaintiff here at the expense of other Indians. *Nance v. Environmental Protection Agency,* 645 F.2d 701, 711 (9th Cir.1981), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). The recommendations

of the California Indian Task Force Report looked to the good of all the Indian cestuis que trust, not just "the landed few." Nothing in this record suggests that the Secretary of the Interior acted other than with attention to the various needs of all the Indian groups involved. The Central California Agency needed relief from its burden of caring for the Modoc and Lassen Indians. Bringing these groups under the Northern California Agency required a new look at the Hoopa Valley location. Redding was not an unreasonable place to pick as the center for serving all the northern groups.

 The "Guidelines for Consultation with Tribal Groups on Personnel Management within the Bureau of Indian Affairs" are not conceded by the Bureau to have the force of law, in contrast to the governmental concession made in *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 718 (8th Cir.1979). Nor are these Guidelines the same as regulations that must be applied because "the rights of individuals are affected." *Morton v. Ruiz*, 415 U.S. 199, 235–36, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). The Guidelines are in letter form and unpublished. They call for consultation where major moves affect the Indians. They give direction to the Bureau. They do not establish legal standards that can be enforced against the Bureau.

Even if the Guidelines were binding, they have not been violated here. The Bureau has produced convincing evidence that the California Indians were consulted about the transfer in 1984, 1985, and 1986. Consultation is not the same as obeying those who are consulted. The Hupas were heard, even though their advice was not accepted. No violation of the Administrative Procedure Act has been shown.

We conclude that the Hupas have shown no probability of success on the merits of their due process claim, their Administrative Procedure Act claim, or their fiduciary duty claim. They have no contract claim. We agree with the district court that no violation of the National Environmental Policy Act has been suggested. No irreparable injury to property has been shown because no property of the tribe is threatened. No serious questions have been raised.

REVERSED.