64 F.3d 1266
 95 Cal. Daily Op. Serv. 6595, 95 Daily Journal
D.A.R. 11,299
Margaret GREENE, in her capacity as Chairman of the Samish
Indian Tribe of Washington; Samish Indian Tribe,
of Washington, Plaintiffs-Appellees,
v.
Bruce E. BABBITT,* in his capacity as
Secretary of the Interior, Defendant-Appellant.
 No. 92-37010.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 1994.
Decided Aug. 22, 1995.
 
 David C. Shilton, U.S. Dept. of Justice, Washington, DC, for defendant-appellant.
 Russel L. Barsh, Anacortes, WA, for plaintiffs-appellees.
 James H. Jones, Bell & Ingram, Everett, WA, amicus curiae for appellant Tulalip Tribes of Washington.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, SCHROEDER, and BRUNETTI, Circuit Judges.
 Opinion by Judge SCHROEDER; Dissent by Judge WRIGHT.
 SCHROEDER, Circuit Judge:
 
 
 1
 The Secretary of the Interior appeals the district court's decision that the plaintiff group of Samish Indians, and their Chairman, Margaret Greene, receive a formal adjudication under the Administrative Procedure Act, 5 U.S.C. Sec. 554, to determine whether or not the Samish are entitled to be recognized as a "tribe" by the federal government. The Samish seek such recognition in order to qualify for various benefit programs for Indians that, since the 1970s, have been made available only to members of recognized tribes. In the district court they successfully challenged the informal procedures the defendant Secretary of Interior established in 1978, see 25 C.F.R. Part 83 (1978), as violative of due process.
 
 
 2
 In ruling in favor of the Samish, the district court found as a matter of fact that individual Samish had received health and other benefits in the 1970s that were cut off by virtue of the lack of tribal recognition. The district court then ruled as a matter of law that because entitlements depended on tribal recognition, the Samish had established constitutionally protected property interests that entitled them to a due process hearing before benefits were eliminated on account of lack of tribal recognition. The court further ruled that the existing regulatory procedures lacked any provision for a hearing, cross-examination of witnesses, or inspection by the applicant tribe of the actual record on which the administrative decision was based, and therefore violated due process.
 
 
 3
 In this appeal, as in the district court, the Tulalip Tribe appears amicus curiae to argue that the Samish are collaterally estopped from litigating any issue of tribal recognition. They contend estoppel results from the litigation that culminated in United States v. Washington, 641 F.2d 1368 (9th Cir.1981) (Washington II ). That case finally determined the Samish were not entitled to tribal treaty fishing rights. We denied the Tulalip's application for intervention on the ground that the issues of tribal recognition and treaty tribe status were fundamentally different. See Greene v. United States, 996 F.2d 973 (9th Cir.1993). We reach the same conclusion here and hold that the Washington II litigation does not preclude the Samish's pursuit of recognition as a tribe for purposes of securing benefits for its members under federal entitlement programs available to Indians. On the merits, we affirm the district court.
 
 Procedural Background
 
 4
 The Samish Indian Tribe of Washington initially sought federal recognition in 1972, after Congress began conditioning eligibility for most programs benefitting American Indians upon status as a tribe recognized by the federal government. See, e.g., 25 U.S.C. Secs. 450-450n (extending benefits to Indian tribes "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians"). In 1978 the Department of the Interior published final regulations governing the procedure for official recognition of Indian Tribes. 25 C.F.R. Part 83. Under the 1978 regulations, the Department conducts its own research, accepts materials from the petitioning tribe and any other interested party, publishes proposed findings and a summary of evidence supporting the federal findings, and makes a final decision after a 120-day notice and comment period. There is no provision for a hearing. The petitioning tribe is not entitled to see the materials submitted by others.
 
 
 5
 Apparently the Secretary took no action on the original petition until after the 1978 regulations were promulgated, and the Samish filed a revised petition under the new regulations in October 1979. On November 4, 1982, the Assistant Secretary of Indian Affairs published a notice with findings that the Samish should not be recognized by the federal government. The 120-day period for objecting to these proposed findings was delayed several times as the Samish sought discovery, under the FOIA, 5 U.S.C. Sec. 552, of much of the evidence relied upon by the Secretary. The final decision denying recognition was published February 5, 1987. Following the Secretary's denial of reconsideration, the Samish Tribe and its Chairman, Margaret Greene, filed this complaint in district court in April of 1989. On February 25, 1992, the district court vacated the Department of Interior's decision denying recognition and remanded the recognition petition for a formal adjudication pursuant to the APA.
 
 
 6
 In this appeal we first must consider the Tulalip's position that the litigation is barred by principles of issue preclusion. We then must address the government's principal contentions, which are: (1) that the district court erred in holding that the Samish had property interests protected by the Due Process Clause; (2) that the court erroneously found as a matter of fact that the government actually cut off benefits of individual Samish when tribal acknowledgment became a prerequisite to continuing eligibility; and (3) that even if the plaintiffs had demonstrated a property interest, the process provided by the 1978 regulations is adequate to protect that interest.
 
 Collateral Estoppel
 
 7
 The amicus Tulalip Tribe contends that any consideration of the Samish Tribe's petition for recognition is barred by United States v. Washington, 641 F.2d 1368 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). The government has never seriously urged such issue preclusion, and the district court rejected it.
 
 
 8
 In the Washington litigation, the Samish and other unrecognized Indian tribes sought a judicial declaration that they were successors in interest to tribes that were parties to the Treaty of Point Elliott, and that they were therefore entitled to share in the fishing rights secured by that Treaty and currently enjoyed by the Tulalip Tribe, among others. The Tulalip Tribe has participated in this litigation because of concern that recognition of the Samish as a Tribe could lead to Samish eligibility for treaty fishing rights in already over-fished fisheries. The district court held that the treaty rights adjudicated in Washington II and the tribal recognition leading to government benefits for individual Samish are distinct issues.
 
 
 9
 In this appeal, the Tulalip Tribe emphasizes that in the petition for recognition, the Samish Tribe has not claimed to be any tribe other than the historical Samish Tribe that was party to the Treaty of Point Elliott. To the extent that the Samish rely upon historical roots in this litigation, the roots are probably the same as those they posited in Washington II. However, other decisions of this court demonstrate that the legal issue and the factual issue, as well as the stakes, are very different.
 
 
 10
 We specifically recognized the distinctions in United States v. Washington, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), (Washington I ), in which we held that a tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights. We said:
 
 
 11
 Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine.
 
 
 12
 Id. at 692-93. Once a tribe is determined to be a party to a treaty, its rights under such a treaty may be lost only by unequivocal action of Congress. Id. at 693. Thus, the recognition of the tribe for purposes of statutory benefits is a question wholly independent of treaty fishing rights.
 
 
 13
 We further recognized the distinction between treaty fishing rights and tribal recognition in Washington II where we held that the district court had erred in concluding that only federally recognized tribes may exercise treaty rights. We nevertheless affirmed denial of treaty rights on the independent factual finding of insufficient continuous political and cultural cohesion. See 641 F.2d at 1372-74.
 
 
 14
 Our decision in Greene v. United States, 996 F.2d 973 (9th Cir.1993), can leave no serious doubt that our court regards the issues of tribal treaty status and federal acknowledgment as fundamentally different. We there held that the Tulalip Tribe was not entitled to intervene in this very litigation. We did so because the Tulalip's interest in preventing the Samish from gaining treaty fishing rights was not affected by this litigation, involving federal tribal recognition or, as it is termed in the applicable regulation, "acknowledgment." See, e.g., 25 C.F.R. Sec. 83.2 (acknowledgment of tribal existence a prerequisite to the federal protection, services and benefits available to Indian tribes). In discussing the difference between the Samish seeking federal acknowledgment and treaty fishing rights, we said in Greene:
 
 
 15
 We recognize that the two inquiries are similar. Yet each determination serves a different legal purpose and has an independent effect. Federal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott.... Similarly, the Samish need not assert treaty fishing rights to gain federal recognition.
 
 
 16
 Greene, 996 F.2d at 976-77.
 
 
 17
 In Greene, we therefore denied the Tulalip the right to intervene in this litigation because we disagreed with their position that Samish success in the case at bar would undermine the finality of the Washington II decision. To uphold the Tulalip position here, that Washington II precludes the present litigation altogether, would be inconsistent with our decision in Greene that the treaty fishing rights issue in Washington II differs from the tribal acknowledgment issue in this litigation.
 
 
 18
 The dissent asserts that the factual issue of tribal cohesiveness in Washington II, in the treaty context, is the same as the showing the BIA administratively requires for acknowledgment purposes. The dissent further assumes that as a matter of law such a showing is necessary to qualify for federal benefits. If the dissent were correct, Greene would have reached exactly the opposite result. We there squarely rejected the Tulalip's position that federal recognition of the Samish would be inconsistent with Washington I and II. Instead, we agreed with the district court in Greene that the question of federal recognition as a tribe "did not implicate treaty claims." Greene at 975. We are bound by Greene.
 
 
 19
 We therefore affirm the district court's conclusion that the Samish petition is not barred by issue preclusion.
 
 Property Interest
 
 20
 The government's principal position on the merits of this appeal is that the Samish have not proved that they have been deprived of any property interests protected by the Due Process Clause. The district court ruled that because individual Samish had received benefits in the 1970s that were cut off because of the government's lack of acknowledgment of the Samish as a tribe, the individuals so affected had lost property interests protected by the Due Process Clause, and this required the government to afford the tribe due process in considering its application for tribal recognition.
 
 
 21
 The government has never seriously disputed that any individual Samish who were qualified for benefits before the imposition of the tribal eligibility requirement had property interests protected by the Due Process Clause. See, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982). It is well-established that fundamental health and welfare benefits to which an individual is entitled cannot be removed without a hearing to determine eligibility. See, e.g., Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Holbrook v. Pitt, 643 F.2d 1261 (7th Cir.1981).
 
 
 22
 In the landmark opinion of Goldberg v. Kelly, (holding that welfare recipients are entitled to a pretermination hearing), Justice Brennan wrote: "It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity' ". See Goldberg, 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8. Subsequently, in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (Board of Regents ) the Court expounded upon the constitutional contours of "property" in the context of entitlements. The language is instructive:
 
 
 23
 Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
 
 
 24
 Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in Goldberg v. Kelly ... had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.
 
 
 25
 Roth at 577, 92 S.Ct. at 2709 (emphasis added). The property interest can also stem, as here, from federal law. See Parks v. Watson, 716 F.2d 646, 656 (9th Cir.1983). In Association of Orange County Deputy Sheriffs v. Gates, 716 F.2d 733, 734 (1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984), the Ninth Circuit elaborated on Roth by noting that "[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." (Emphasis added).
 
 
 26
 In the years since Goldberg, the Supreme Court has found protectable property interests in things as disparate as welfare benefits, disability benefits, utility service, high school education, government employment, a driver's license and a horse trainer's license. See Logan, 455 U.S. at 431, 102 S.Ct. at 1155. As the Court explained in Logan:
 
 
 27
 The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause'.... Once that characteristic is found, the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'
 
 
 28
 Logan, 455 U.S. at 430, 102 S.Ct. at 1155.
 
 
 29
 The government argues, however, that the district court erred in ordering a hearing for the tribe. None of the cases upon which it relies, however, involve the denial of fundamental benefits to individual tribal members. In Hoopa Valley Tribe v. Christie, 805 F.2d 874, 879 (9th Cir.1986), modified 812 F.2d 1097 (9th Cir.1986), we held that a tribe did not have a property interest in the BIA's continued operation of an office on the reservation. Hoopa Valley reversed a district court injunction that stayed the move pending a due process hearing before an impartial decision maker. Our court reasoned that no valid treaty or law guaranteed the office's location, and that the tribe's interest in its location could not rise to the level of a property interest. In discussing Logan and Board of Regents, we stressed that those cases recognized that property rights are individual entitlements consisting of " 'interests that a person has already acquired in specific benefits'." 812 F.2d at 1102 (quoting Board of Regents ). We said that "[e]xpectations of employment or economic benefits to the community in general are not property within the meaning of the Fifth Amendment." Id. The government similarly relies upon Punikaia v. Clark, 720 F.2d 564, 566 (9th Cir.1983) (unilateral expectation of continued service at a particular state-operated leprosy hospital did not give rise to a due process claim). In Punikaia we followed O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), which held that nursing home patients did not have a property interest in receiving care at a particular facility. See Punikaia, 720 F.2d at 567-68. The decisions in both O'Bannon and Punikaia expressly distinguished an interest in continued treatment at a particular facility, affecting no property interest, from the denial of financial benefits that does affect a property interest.
 
 
 30
 The district court's decision in this case is fully consistent with the reasoning of those cases. The district court based its injunction upon a finding of loss of individual financial benefits of a nature that did not exist in Hoopa Valley, O'Bannon and Punikaia. The district court found a property interest in individual entitlements, not in collective hopes.
 
 
 31
 The government also argues that when an individual is denied benefits because the tribe lacks recognition, it is the individual, and not the tribe, that is the entity deprived of due process. The government therefore contends that a lawsuit by the tribe and its chairman is not the appropriate forum for determining entitlement qualifications of individual Samish. We would agree with the government if the characteristic on which the entitlement now depends were an individual attribute best determined on an individual basis. But the entitlements in this case hinge on tribal, rather than individual, status. Consequently, we do not agree with the government that each individual seeking a particular benefit lost as a consequence of the lack of tribal recognition must individually establish the eligibility of all the Samish for tribal recognition.
 
 
 32
 The district court correctly rejected this contention on the ground that the tribe and its chair, as representatives of all individuals affected by the nonrecognition, are the appropriate entities to pursue federal acknowledgment on behalf of the tribe. This principle is recognized by the challenged Federal Regulations themselves, which provide for applications for acknowledgment by a petitioning group, not by individual members of the petitioning tribe. See 25 C.F.R. Part 83.4 (1978) (providing that "any Indian group in the continental United States which believes it should be acknowledged as an Indian tribe, and can satisfy the criteria in Sec. 83.7, may submit a petition requesting that the Secretary acknowledge the group's existence as an Indian tribe").
 
 
 33
 The regulations therefore support our conclusion that the process accorded the tribe is the critical issue for purposes of determining whether individual Samish qualify for federal benefits available only to members of Indian tribes; the benefits are ones that the government itself has made dependent, in all respects relevant to this case, on tribal, not individual, status.
 
 
 34
 The government points out that the Samish, as a group, having never enjoyed tribal recognition, have no entitlement to it. The government also correctly points out that Congress is free to change eligibility criteria for federal benefits in the course of the normal legislative process. Congress need not provide due process for individuals before it changes the law, and is free to tighten eligibility requirements. See Atkins v. Parker, 472 U.S. 115, 129, 105 S.Ct. 2520, 2528, 86 L.Ed.2d 81 (1985). There is a difference "between losing what one has and not getting what one wants." Henry J. Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1296 (1965).
 
 
 35
 The problem in this case is, however, that as a consequence of the narrowing of eligibility criteria, individual benefits may be lost. The district court recognized that problem and therefore focused on the loss of individual benefits as the trigger for due process concerns. It held that once Congress has narrowed eligibility for fundamental health and welfare benefits by conditioning eligibility on tribal recognition, the due process clause requires a meaningful hearing to determine whether those previously eligible can meet the new and narrowed requirements. We conclude that the district court was correct. To hold otherwise would be to sanction possibly arbitrary and unjustified elimination of individual property interests in contravention of the settled principle first recognized in Goldberg v. Kelly, that entitlement to fundamental benefits represents a property interest implicating the protection of the due process clause. See id., 397 U.S. at 269, 90 S.Ct. at 1021. As the district court observed:
 
 
 36
 It is sophistry to argue that the decision not to recognize the Samish as a tribe is unrelated to the discontinuation of benefits previously received. The protections of the Fifth Amendment would be seriously impaired if this court allowed the government to cut off benefits without a hearing by creating new eligibility requirements and then summarily holding that current benefit recipients do not meet the new requirements.... Administrative agencies should not be allowed to cut off benefits to all recipients without procedural safeguards every time Congress alters the eligibility requirements of a government program.
 
 
 37
 Accordingly, when Congress determined that tribal recognition was a prerequisite to benefits previously received on an individual basis, due process required the agency charged with administration of the requirement to afford a meaningful hearing for those who would be deprived of benefits.
 
 Whether Individual Samish Were Affected
 
 38
 The government also contends that even if tribal due process concerns are triggered by individuals' loss of benefits as a result of the lack of tribal recognition, the tribe has not demonstrated that any individuals actually were receiving benefits before tribal recognition became a prerequisite. This issue is apparently raised for the first time on appeal. Before the district court, it was not seriously disputed that individual Samish were receiving benefits and treated by the government as eligible for Indian programs. The record contains many references to Samish receiving benefits, and the government admitted in its answer that before 1977 it had issued blue identity cards to Samish that made them eligible for Indian benefits.
 
 
 39
 Before the district court, the question was whether the benefits were being received on an individual basis, or because the government had officially recognized the Samish as a tribe. The Samish asked the district court to hold that it had been officially recognized and that the government was estopped from arguing that the Samish should not be acknowledged. The district court found: "While the evidence does not establish that the Samish received benefits based on their tribal status, the evidence does show that members of the Samish Tribe began to lose benefits after 1975 because of their lack of recognition." Because the government's records were poor and inconclusive as to official recognition, and because it was clear that benefits were being denied after 1975 because of a lack of recognition, the district court held that the Samish were entitled to a due process hearing.
 
 
 40
 There is no basis for us at this late date to question whether individual Samish were affected by the government's insistence upon tribal status in the 1970s.
 
 What Process is Due
 
 41
 The district court held that the procedures afforded the tribe in 25 C.F.R. Part 83 were constitutionally inadequate and ordered a formal adjudication under the provisions of the Administrative Procedure Act in the absence of any other existing mechanisms. The district court found the Department of Interior Regulations inadequate in a number of ways. The petitioning tribe could not call witnesses; there was no argument permitted before the authority making the decision; the petitioning tribe did not have access to all of the material evidence and therefore had to speculate whether its materials adequately addressed materials submitted by others. The district court also questioned the impartiality of those making the decision because of possible ex parte contacts reflected in the record and other indications that the issue in the particular case may have been prejudged.
 
 
 42
 Due process generally includes an opportunity for some type of hearing before the deprivation of a protected property interest. See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1317 (9th Cir.1989). The Supreme Court has noted that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Goldberg, 397 U.S. at 269, 90 S.Ct. at 1021. To decide whether the informal tribal acknowledgment procedures the government established in 1978 are sufficient, we must look to the balancing test enunciated in Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976). This test requires the weighing of the interest affected against the burdens additional procedural safeguards would impose:
 
 
 43
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 44
 See id. at 335, 96 S.Ct. at 903.
 
 
 45
 Here the interests affected by meeting threshold eligibility requirements for the myriad federal benefits available to Indians is very great. The risk that such eligibility might unfairly be denied is real because of the lack of procedural safeguards. While the government prefers to view its determination as a benign and paternalistic one, this litigation has been both protracted and highly adversarial. At least one other group of Indians sees its interest as antithetical to that of the Samish and has sought intervention to oppose recognition for the Samish. See Greene, 996 F.2d at 975-76. Informal decision-making, behind closed doors and with an undisclosed record, is not an appropriate process for the determination of matters of such gravity. As the district court pointed out, the substantive standards the department has adopted in 25 C.F.R. Sec. 83.7 "require[ ] the BIA to make inquiries into the social and political structure of the petitioning tribe. Such matters are inherently complex and prone to mischaracterization."
 
 
 46
 We must also consider administrative burdens. Subsequent to the district court's order in this case, the government promulgated new regulations for reviewing petitions for tribal acknowledgment. See 25 C.F.R. Part 83 (1994). The new regulations grant the Interior Board of Indian Appeals the authority to order hearings in the event it finds genuine issues of material fact. See 25 C.F.R. Sec. 83.11(e)(4). Thus, the government itself has recognized that providing a formal hearing before an independent decision-maker presents no insurmountable administrative burden in this context. Such procedures are routine in other types of federal entitlements. See, e.g., 20 C.F.R. Sec. 404.929 (right to a social security hearing before an administrative law judge). The old regulations, however, not the new, were applied in the proceedings we now review.
 
 
 47
 While the government is correct that the Administrative Procedure Act, by its terms, does not mandate a formal hearing to petitioning Indian tribes in accordance with the APA requirements, the Samish demonstrated that due process requires far more procedural protections than the informal procedures used by the Department of Interior in denying them tribal recognition. The district court therefore chose the APA as an appropriate model, after finding that "the burden that a formal hearing will put on the agency is substantially outweighed by the material impact of non-recognition on the lives of numerous people, and the danger of an erroneous decision." The government provides no basis to overturn the district court's conclusion.
 
 
 48
 AFFIRMED.
 
 
 49
 EUGENE A. WRIGHT, Circuit Judge, dissenting.
 
 
 50
 Because United States v. State of Washington, 641 F.2d 1368 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982) (Washington II ),[1] collaterally estops the Samish Tribe's petition for recognition, I respectfully dissent.
 
 
 51
 The Board of Indian Affairs procedure for establishing status as a statutory tribe requires a number of factual showings, including:
 
 
 52
 (c) A statement of facts which establishes that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.
 
 
 53
 25 C.F.R. Sec. 83.7. In United States v. Washington, 520 F.2d 676, 693 (9th Cir.1975), we held that "[w]hether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question." In Washington II, we affirmed the district court's factual finding that "[the Samish Indians] had not functioned since treaty times as [a] continuous separate, distinct and cohesive Indian culture or political community." 641 F.2d at 1373 (internal quotation omitted).
 
 
 54
 Washington II precludes a finding that the Samish Tribe has "maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present." 25 C.F.R. Sec. 83.7(c). Washington II involved the same factual inquiry into the historicity of the present Samish Tribe. Such an inquiry is a necessary condition both for treaty recognition and for statutory recognition under the current BIA regulations. We have here substantial overlap in evidence and argument, save for subsequently developed evidence; and the claims, although not identical, are closely related. See Restatement (Second) of Judgments, Sec. 27 (1982).
 
 
 55
 The majority would circumvent collateral estoppel by distinguishing the legal issues of tribal treaty status and federal recognition. But under the issue preclusion rule, if a factual issue was actually litigated and resolved by a valid and final judgment, the determination is subsequently conclusive between the parties, whether on the same or a different claim. Id. The factual finding regarding the Samish Tribe's historicity in Washington II precludes what would be a near identical inquiry in this case.
 
 
 56
 The majority misconstrues our decision in Greene v. United States, 996 F.2d 973 (9th Cir.1993). Greene does not conflict with a finding of issue preclusion here. In that case, we held that the Tulalip Tribes were not entitled to intervene in the Samish Tribe's action for federal recognition. The Tulalip feared that recognizing the Samish would lead to the dilution of its treaty fishing rights. Simply put, we rejected the Tulalip's argument by distinguishing between the legal issues of federal acknowledgment and treaty fishing rights. Such a distinction is inapposite to the factual issue preclusion that the majority fails to acknowledge in this case.
 
 
 57
 I dissent.
 
 
 
 *
 Bruce E. Babbitt, the current Secretary of Interior, is substituted for former Secretary Lujan. See Fed.R.App.Pro. 43(c)(1)
 
 
 [1]
 District Judge Rothstein's recent denial of the Duwamish, Snohomish and Steilacoom Tribes' motion under Fed.R.Civ.P. 60(b) to reopen the district court's judgment in Washington II emphasizes the finality of that case. United States v. State of Washington, No. 9213-R (W.D.Wa. filed Jan. 23, 1995)