*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WALTER JOSEPH CASWELL,

        Defendant-Appellant.

FOR PUBLICATION
February 11, 2021
9:15 a.m.

No. 353537
Mackinac Circuit Court
LC No. 19-008346-AR

Before: BECKERING, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant, Walter Joseph Caswell, is a member of the Mackinac Tribe of Odawa and Ojibwa Indians (the "Mackinac Tribe"). In October 2018, a Department of Natural Resources (DNR) conservation officer cited defendant for spear fishing in a closed stream in violation of MCL 324.48715 and MCL 324.48711.[1] Defendant moved to dismiss the charges on the ground that he was a member of an Indian tribe or band granted hunting and fishing rights by 1836 and 1855 treaties with the United States federal government. The Mackinac County district court granted defendant's motion upon concluding that the Mackinac Tribe was entitled to rights under the relevant treaties. On appeal from the prosecutor, the Mackinac County circuit court reversed on the ground that the Mackinac Tribe was not federally recognized and that federal tribal recognition is a matter for initial determination by the United States Department of the Interior. We granted defendant's delayed application for leave to appeal.[2] For the reasons explained below, we vacate the circuit court's order and remand the case to the district court for an evidentiary hearing consistent with this opinion.

---

[1] MCL 324.48715 was repealed by 2018 PA 529, effective December 28, 2018. However, at the time of the offenses, the statute was in effect. MCL 324.48711 was amended by 2018 PA 529 as well, but the changes were mainly editorial and do not affect this case.

[2] *People v Caswell*, unpublished order of the Court of Appeals, entered May 4, 2020 (Docket No. 353537).

## I. PERTINENT FACTS AND PROCEEDINGS

In the Treaty of 1836, a group of Indian tribes collectively referred to as the Ottawa (or Odawa) and Chippewa Nations ceded to the federal government nearly 14 million acres in what is now Michigan's eastern Upper Peninsula and western Lower Peninsula. *People v LeBlanc*, 399 Mich 31, 38; 248 NW2d 199 (1976). The treaty preserved the tribes' rights to hunt and fish on the ceded lands. *Id*. at 38, 41. In the Treaty of 1855, the federal government dissolved the concept of an Odawa/Chippewa Nation, and addressed reservation boundaries regarding several different tribes. *Mackinac Tribe v Jewell*, 829 F3d 754, 755 (2016). The 1855 treaty did not affect the fishing rights retained in the 1836 treaty. See *LeBlanc*, 399 Mich at 55-58.

During the next 150 years, disputes arose concerning the hunting and fishing rights under the treaties. In an attempt to resolve disputes regarding inland treaty rights (as opposed to fishing rights on the Great Lakes), the Michigan DNR signed a hunting and fishing consent decree in 2007 with five federally-recognized tribes. The decree, known as the 2007 Inland Consent Decree ("Consent Decree"), defines the extent of inland hunting, fishing, and gathering rights for tribal members. Under the Consent Decree, the tribes generally regulate hunting and fishing seasons for their tribal members, and may also regulate hunting and fishing methods, including spear fishing.[3]

Defendant was spear fishing in a Mackinac County stream within the ceded lands subject to the 2007 Inland Consent Decree when the conservation officer cited him for fishing in a trout stream out of season and fishing by illegal means. At the time, defendant had a fishing license issued by the State of Michigan, but the license did not allow spearfishing or fishing out of season. Defendant also had a tribal fishing card issued by the Mackinac Tribe, which apparently allowed spearfishing, and had no seasonal limitation.

As indicated, defendant moved to dismiss the charges on the ground that he is a member of a tribe with hunting and fishing treaty rights. At the hearing on the motion to dismiss, the DNR conservation officer testified that the State of Michigan does not accept the Mackinac Tribe's assertion of treaty rights because the Mackinac Tribe was not a signatory to the 2007 Inland Consent Decree. The officer testified that only members of the five tribes that signed the consent decree could hunt, fish and gather in the area ceded to Michigan in the 1836 treaty, and he did not believe the Mackinac Tribe was associated with any of those five tribes.

Barry Wallace Adams testified on defendant's behalf. He identified himself as the "Chairman of the Mackinac Tribe of Odawa," which was referred to as the Mackinac Tribe, and he affirmed that defendant was a member of the tribe. He testified that the Mackinac Tribe was descended from "Anise Band 15 and 16, Point of St. Ignace, and the Band 16 is Pointe of Aux Chenes" and was a signatory to the 1836 and 1855 treaties. He indicated that the modern-day Mackinac Tribe consisted of Ojibwa excluded from the Sault St. Marie Tribe after it closed its

---

[3] See generally "2007 Inland Consent Decree FAQs," https://www.michigan.gov/documents/dnr/2007_Inland_Consent_Decree_FAQs_9.28.17_60450 2_7.pdf (accessed February 3, 2021).

rolls. It is not clear from Adams's testimony when or under what precise circumstances this occurred.

Defendant also submitted three documents for admission as exhibits. He first submitted a copy of his "Tribal Subsistence Harvesting License." The license was issued by the Mackinac Tribe of Odawa and Ojibway Indians, with a Durant Census Record number indicating that he was a member of Band 16. Next, he submitted a "Certificate of Decree of Indian Blood" from the United States Department of the Interior Bureau of Indian Affairs. This document certified defendant as "1/64 Mackinac Band Chippewa Indian," and stated that his "great-great-great-grandmother, Mrs. Antoine Paquin, is listed as number No. 342 on the 1836 Census Register of the Ottawa and Chippewa Nations." The letter also informed defendant that, although the document verified his Indian descent, verification did not entitle him to tribal membership. Lastly, defendant submitted his tribal membership card, which identified him as "A Member of The Mackinac Tribe of Odawa and Ojibwa Indians Bands 11 thru 17 and Cheboygan Bands."

The district court ruled in defendant's favor. The court found that "the Mackinac Tribe was a signatory to [the 1836 and 1855] treaties" because it had not been "disputed either through testimony or through written briefs that were submitted to the Court."[4] It further found that defendant had proven he was a member of the Mackinac Tribe and possessed a valid tribal fishing license. Thus, it framed the controlling legal issue as "whether or not members of a tribe federally recognized or otherwise can be divested of their hunting, fishing, gathering rights afforded to them in the 1836 and 1855 treaties with the United States." Based on its review of United States Supreme Court decisions governing the interpretation of treaties, the district court rejected the DNR's position that the 2007 Inland Consent Decree cut off any treaty rights to which defendant might be entitled. The court expressed that it was "at a loss as to how the state has authority to divest members of the tribes that were not signatories to the 2007 [Consent Decree], understanding that tribal hunting, fishing, gathering rights are given in the 1836 and 1855 treaty." The court concluded,

> [O]nce tribal members receive hunting, fishing, gathering rights under treaty, they continue regardless of further state regulation.
>
> Therefore, the Court will concur with the Defendant and dismiss the matter, as the restriction of hunting, fishing, gathering rights in this case to tribal members who were not signatories to the 2007 compact violates the essence of the intent of the signatories in the 1836 and 1855 treaties.

The prosecutor appealed the district court's ruling. On appeal, the Mackinac County circuit court ruled in the prosecution's favor, reversing the district court and reinstating the charges

---

[4] One sentence in the district court decision contains an apparent scrivener's error. The court found that the Mackinac Tribe was a signatory to the 1836 and 1855 treaties, but in a scrivener's error the court later wrote, "The fact that the Mackinac Tribe of Odawa and Ojibwa Indians was not [sic] a signatory was not disputed either through testimony or through written briefs that were submitted to the Court."

against defendant. In its opinion, the circuit court opined that "it need not look further than the most recent case involving the Mackinac Tribe in *Mackinac Tribe v Jewell*, 829 F3d 754 (2016) for direction in resolving the matter before the Court." Relying on *Jewell*, the circuit court observed that the Mackinac Tribe was not a federally-recognized tribe and concluded that the matter of federal tribal recognition is reserved to the United States Department of the Interior. We granted defendant's delayed application for leave to appeal.

## II. ANALYSIS

As the parties acknowledge, this case presents an issue of first impression in Michigan. We must ascertain the proper legal framework in which to assess whether a defendant is entitled to assert his tribal status as a defense to state fishing regulations.

Defendant claims the circuit court erred by relying on *Jewell* as its legal foundation when reversing the district court's order dismissing the charges against him. *Jewell* involves federal recognition of the Mackinac Tribe, but according to defendant, whether a tribe is federally recognized has no bearing on whether the tribe is entitled to exercise treaty rights. Defendant contends that because there is no dispute that the Mackinac Tribe was a "signatory" to the 1836 and 1855 treaties, and he is a member of the Mackinac Tribe with a valid tribal fishing license, he is entitled to exercise treaty fishing rights and to assert that fact as an affirmative defense to the criminal charges filed against him. While defendant concedes Michigan has the power to regulate fishing, he notes that it may not impose regulations restricting the exercise of treaty fishing rights absent an established conservational necessity, which has not been established here. Accordingly, he argues that the circuit court should have affirmed the district court's dismissal of the charges against him. The prosecution contends the circuit court properly rejected defendant's argument because the Mackinac Tribe is not federally recognized.

As an initial matter, we observe that a modern-day tribe whose members descend from a tribe that signed a treaty may be, but is not typically, referred to as a "signatory tribe." That designation is usually reserved for the historical tribe whose representatives actually signed a treaty. See e.g., *United States v State of Washington*, 641 F2d 1368 (CA 9, 1981) (*Washington II*) (referring to modern-day tribes whose members indisputably descend from tribes that signed the relevant treaties as "descendants of treaty-signatory tribes"). A modern-day tribe that has established its right to exercise the treaty rights of a signatory tribe is often referred to as a "treaty tribe" (sometimes, "treaty Indians") See *United States v State of Washington*, 520 F2d 676, 693 (CA 9, 1975) (*Washington I*). For purposes of clarity, this is how we will use these terms. In accordance with this usage, the Mackinac Tribe is not a "signatory" to the 1836 and 1855 treaties, even though some of its members appear to be descendants of a signatory tribe. The issue is whether it qualifies as a treaty tribe.

Having said that, we agree with defendant that whether the Mackinac Tribe is federally recognized has no bearing on whether it is entitled to treaty fishing rights. However, we disagree that membership in a modern-day tribe whose members descend from a signatory tribe

automatically entitles the modern-day tribe to treaty rights.[5] As discussed below, we conclude that the dispositive issue is whether the Mackinac Tribe is a political successor in interest to a signatory tribe, entitling defendant to an affirmative defense based on his tribal status. Neither the circuit court nor the district court addressed this issue.

## A. STANDARDS OF REVIEW

This Court reviews for an abuse of discretion a trial court's decision on a motion to dismiss charges against a defendant. *People v Parlovecchio*, 319 Mich App 237, 239-240; 900 NW2d 356 (2017). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*. at 240 (quotation marks and citation omitted). In addition, "[a]n abuse of discretion occurs when, for example, a trial court premises its decision on an error of law." *People v Parker*, 319 Mich App 664, 669; 903 NW2d 405 (2017). This Court reviews de novo both questions of law and questions of constitutional law. *People v Bensch*, 328 Mich App 1, 4 n 2; 935 NW2d 382 (2019); *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014). Finally, this Court reviews for clear error the trial court's findings of fact in a motion to dismiss. See *People v Vansickle*, 303 Mich App 111, 114; 842 NW2d 289 (2013). Clear error occurs when the reviewing Court is "left with a firm conviction that the trial court made a mistake." *Id*. at 11.

## B. FEDERAL RECOGNITION AND ENTITLEMENT TO TREATY RIGHTS

Federal recognition and a tribe's entitlement to treaty rights are two distinct issues. Federal recognition of Indian tribes is an administrative process of the United States Department of the Interior Bureau of Indian Affairs.[6] 25 CFR 83.1 *et seq*. The process and criteria are listed in Part 83 of the applicable federal regulations. To be federally recognized, a group must submit a petition demonstrating various historical and cultural criteria. 25 CFR 83.11. Federal recognition is a prerequisite to a tribe's receipt of federal money for tribal programs, it establishes a government-to-government relationship between the United States and the tribe, and it establishes certain immunities, privileges, and powers. 25 CFR 83.2.

---

[5] Treaty rights do not belong to individual Indians, even if they are descendants of treaty-signatory tribes. See *Washington v Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 US 658, 675, 679; 99 S Ct 3055, 61 L Ed 2d 823 (1979), mod sub nom *Washington v United States*, 444 US 816; 100 S Ct 34; 62 L Ed 2d 24 (1979). However, treaty rights can be asserted by individual members of the tribe. *United States v Winans*, 198 US 371, 381; 25 S Ct 662, 664; 49 L Ed 1089 (1905).

[6] In 2009, the regulatory terminology changed, and the term "federal recognition" is now known as "federal acknowledgment." 25 CFR 83.1 (2009). The parties and the lower courts in this case use the term "federal recognition." For clarity, we will use the term "federal recognition" in this decision.

In contrast to the administrative process of federal recognition, an Indian treaty is a binding "contract between two sovereign nations." *Washington v Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 US 658, 675; 99 S Ct 3055, 3069; 61 L Ed 2d 823, mod sub nom *Washington v United States*, 444 US 816; 100 S Ct 34; 62 L Ed 2d 24 (1979). Treaty rights vest at the time the treaty is signed. *Washington I*, 520 F2d at 692. Once a treaty is signed, only Congress has the authority to abrogate the treaty, and only if Congress has stated an unequivocal intent to abrogate. See *United States v Dion*, 476 US 734, 738-740; 106 S Ct 2216, 2219; 90 L Ed 2d 767 (1986).

As we already noted, no Michigan appellate court has addressed the issue of the relationship, if any, between federal tribal recognition and the assertion of treaty rights. However, a series of decisions from the Ninth Circuit Court of Appeals has established that a tribe's federal recognition status and its entitlement to exercise treaty fishing rights are separate issues.[7]

In *Washington I*, 520 F2d at 683, 693, the Ninth Circuit affirmed that "the state and its agencies can regulate off-reservation fishing by treaty Indians at their usual and accustomed grounds only if the state first satisfies the court that the regulation is reasonable and necessary for conservation." Pertinent to the instant case, the Ninth Circuit also affirmed that two tribes (the Stillaguamish and the Upper Skagit) were entitled to exercise treaty fishing rights, even though they were not recognized by the federal government as organized tribes. *Washington I*, 520 F2d at 692-693. The federal appeals court explained, "[n]onrecognition of the tribe by the federal government . . . may result in loss of statutory benefits, but can have no impact on vested treaty rights." *Id*. Thus, *Washington I* established that the questions of whether a tribe is federally recognized and whether it is entitled to exercise treaty rights are two distinct inquiries, and that a tribe does not have to be federally recognized to be entitled to exercise treaty rights.

Following the Ninth Circuit's ruling in *Washington I*, other tribes that were not federally recognized intervened in the *United States v State of Washington* litigation[8] to assert treaty fishing rights. In *Washington II*, 641 F2d 1368, 1372 (CA 9, 1981), the Ninth Circuit affirmed that five intervenor tribes were not treaty tribes, but ruled that the fact the intervenors were not federally recognized was not determinative. Thus, the Ninth Circuit confirmed that whether a tribe was entitled to exercise treaty rights was unrelated to whether it was federally recognized.

That federal recognition and treaty-tribe status are separate issues was again confirmed in cases involving the Samish Tribe, one of the five intervenor tribes deemed not to be a treaty tribe in *Washington II*. In *Greene v United States*, 996 F2d 973 (CA 9, 1993) ("*Greene I*"), the Tulalip Tribes sought to intervene in an action between the Samish Tribe and the Department of the Interior

---

[7] Although we are not bound by the Ninth Circuit's decisions, we may consider them as persuasive authority. See *People v Walker*, 328 Mich App 429, 444-45; 938 NW2d 31 (2019) (quotation marks and citation omitted).

[8] The Ninth Circuit remanded the litigation to the district court, which had "retained continuing jurisdiction to provide advance judicial scrutiny of all future state regulations affecting Indian treaty fishing rights." *Washington I*, 520 F2d at 682, 693.

regarding the Samish Tribe's effort to obtain federal recognition. *Greene I*, 996 F2d at 975. The Tulalip argued that federal recognition of the Samish would lead to claims by the Samish that it could exercise treaty fishing rights; this, in turn, would lead to the dilution of treaty fishing rights. *Id*. at 976. The district court had denied intervention because the action "did not implicate treaty claims." *Id*. at 975. In affirming the district court's ruling, the Ninth Circuit again stressed that federal recognition was not a prerequisite to being entitled to exercise treaty fishing rights, and observed that a number of nonrecognized Washington tribes have treaty rights. *Id*. at 976-77, citing *Washington I*. See also *Greene v. Babbitt*, 64 F3d 1266 (CA 9, 1995) ("*Greene II*") (holding that recognition of a tribe "for purposes of statutory benefits is a question wholly independent of treaty fishing rights").

Finally, in *United States v State of Washington*, 593 F3d 790 (CA 9, 2010) ("*Washington IV*"), the Ninth Circuit en banc addressed the question of whether, after obtaining federal recognition, the Samish Tribe should be able to re-open the denial of its treaty claims in *Washington II*. *Washington IV*, 593 F3d at 792-793.[9] The Ninth Circuit held that it should not, explaining:

> In *Greene II*, we denied any estoppel effect of *Washington II* on the Samish Tribe's recognition proceeding, because treaty litigation and recognition proceedings were "fundamentally different" and had no effect on one another. *Greene II*, 64 F3d at 1270. Our ruling was part of a two-way street: treaty adjudications have no estoppel effect on recognition proceedings, and recognition has no preclusive effect on treaty rights litigation. Indeed, to enforce the assurance in *Greene II* that treaty rights were "not affected" by recognition proceedings, the fact of recognition cannot be given even presumptive weight in subsequent treaty litigation. To rule otherwise would not allow an orderly means of protecting the rights of existing treaty tribes on the one hand, and groups seeking recognition on the other. [*Washington IV*, 593 F3d at 800-801.]

These decisions from the Ninth Circuit persuasively distinguish a tribe's federal recognition status from its entitlement to exercise treaty rights, as "each determination serves a different legal purpose and has an independent legal effect." *Washington IV*, 593 F3d at 795, quoting *Greene I*, 996 F2d at 976. Put simply, federal recognition is not a threshold condition a tribe must establish in order to exercise treaty fishing rights, nor does treaty-tribe status entitle a tribe to federal recognition. *Washington IV*, 593 F3d at 795. While we are not bound by the Ninth Circuit's decisions, see *People v Walker*, 328 Mich App 429, 444-45; 938 NW2d 31 (2019), the Ninth Circuit has handled far more of these cases than apparently any other federal circuit court in

---

[9] The Ninth Circuit met en banc to resolve a conflict between *United States v Washington*, 394 F3d 1152 (CA 9, 2005) (*Washington III*), which held that federal recognition "was an extraordinary circumstance justifying the reopening of *Washington II*" and its line of cases holding that "federal recognition is an independent process that has no effect on treaty rights." *Washington IV*, 593 F3d at 793.

the country, and its reasoning is sound. We agree with its rationale and conclude that a tribe's federal recognition status does not affect its treaty rights.

Given that the Mackinac Tribe's nonrecognition status has no bearing on whether it is entitled to exercise treaty fishing rights, and thus on defendant's affirmative defense, we hold that the circuit court erred when it relied on *Jewell* and reinstated the charges against defendant. The legal issue in *Jewell* is unrelated to the issue at hand. In *Jewell*, the Mackinac Tribe sought to compel the Secretary of the Interior to allow the Tribe to organize under the Indian Reorganization Act, 25 USC 476(a). When the Secretary rejected the Tribe's petition, the Tribe filed suit in the federal district court, asking the court to "declare it a federally recognized Indian tribe and to order the Secretary to conduct an election under the IRA." *Jewell*, 829 F3d at 756-757. The federal district court denied the request, and the DC circuit appeals court affirmed, concluding that the tribe must exhaust administrative remedies before seeking judicial review. The court stated, "when a court is asked to decide whether a group claiming to be a currently recognized tribe is entitled to be treated as such, the court should for prudential reasons refrain from deciding that question until the Department has received and evaluated a petition under Part 83." *Jewell*, 829 F3d at 757.

The circuit court in the case at bar appears to have determined that, under *Jewell*, the administrative concept of federal tribal recognition is equated with the contractual and sovereignty-based concepts of tribal treaty rights. As already discussed, these are two distinct concepts; federal recognition has no bearing on treaty-tribe status, and vice versa. However, that does not mean the district court properly determined that defendant's membership in the Mackinac Tribe entitle him dismissal of the charges. The same Ninth Circuit decisions supporting defendant's assertion that federal recognition status is irrelevant also lay out the necessary analysis to determining whether a tribe constitutes a treaty-tribe.

## C. TREATY-TRIBE STATUS

That members of a modern-day tribe are found to have descended from members of a signatory tribe does not, without more, entitle the modern-day tribe to treaty-tribe status. Rather, "treaty-tribe status is established when a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure." *Washington II*, 641 F2d at 1371, quoting *Washington I*, 520 F2d at 693. Continually maintaining an organized tribal structure is the "single necessary and sufficient condition for the exercise of treaty rights by a group of Indians." *Washington II*, 641 F2d at 1372. "This single condition," explained the Ninth Circuit,

> reflects our determination that the sole purpose of requiring proof of tribal status is to identify the group asserting treaty rights as the group named in the treaty. For this purpose, tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community. [*Id*. at 1372-1373.]

The preservation of a defining characteristic of the original tribe does not mean the tribe has to "have acquired organizational characteristics it did not possess when the treaties were signed." *Id*. at 1373. Further, "changes in tribal policy and organization attributable to adaptation do not destroy tribal status." *Id*. Nor does the degree of assimilation inevitable in response to

shifts in federal policy between favoring tribal autonomy and seeking to destroy it "entail the abandonment of distinct Indian communities." *Id*. Nevertheless, "[t]o warrant special treatment, tribes must survive as distinct communities." *Id*.

These principles are derived from and illustrated in *Washington II*, which affirmed a federal district court ruling that five tribes, indisputably descended from treaty-signatory tribes, could not establish treaty-tribe status. See *United States v State of Washington*, 476 F Supp. 1101 (WD Wash, 1979). The federal appeals court noted that the five tribes

> point to their management of interim fisheries, pursuit of individual members' treaty claims, and social activities as evidence of tribal organization. But the district court specifically found that the appellants had not functioned since treaty times as "continuous separate, distinct, and cohesive Indian cultural or political communities." 476. F. Supp. at 1105, 1106, 1107, 1109, 1110. After close scrutiny, we conclude that the evidence supports this finding of fact. Although the appellants now have constitutions and formal governments, the governments have not controlled the lives of the members. Nor have the appellants clearly established the continuous informal cultural influence they concede is required. [*Id*.]

As the foregoing caselaw establishes, a modern-day tribe is not entitled to exercise treaty rights simply because its members descended from members of a signatory tribe. The dispositive issue in this case is whether the Mackinac Tribe is the political successor in interest to the signatory tribe from which it claims descent. To be a political successor in interest requires demonstrating that "some defining characteristic of the original tribe persists in an evolving tribal community." *Washington II*, 641 F2d at 1373. The district court erred by assuming that the Mackinac Tribe possessed treaty rights merely because some of its members were descended from signatory tribes of the relevant treaty, and that defendant's entitlement to exercise those rights as a member of the Tribe provided him with a valid affirmative defense to the charges against him.

Most of the prosecution's arguments in favor of upholding the circuit court's ruling suffer from the same infirmity as the court's ruling: they equate the right to exercise vested treaty rights with federal recognition. As explained above, these are not the same thing. In addition, the prosecution argues that only a federal court can determine if the Mackinac Tribe is a political successor in interest to a treaty-signatory tribe. On that point, we disagree. We conclude that for the limited purpose of its relevance in this criminal proceeding, the district court can determine whether a preponderance of the evidence supports defendant's affirmative defense that he was exercising treaty fishing rights as a member of a tribe entitled to exercise treaty rights by being a political successor in interest to a treaty-signatory tribe. See *State of Washington v Posenjak*, 127 Wash App 41, 49; 111 P3d 1206 (2005) (determining that the defendant could not avoid prosecution for hunting off-reservation and out of season because he failed to prove that the tribe of which he was a member was a treaty tribe).

## III. CONCLUSION

We conclude that the circuit court erred when conditioning defendant's potential treaty rights on whether his tribe is federally recognized, and we vacate the circuit court's order. But

because the district court did not evaluate the case under the proper legal framework, which we adopt in this ruling, we remand the matter to the district court for an evidentiary hearing to allow defendant an opportunity to establish by a preponderance of the evidence that his Tribe is a political successor in interest to a signatory tribe of the 1836 treaty. This is established when a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure such that some defining characteristic of the original tribe persists in an evolving tribal community.

Vacated and remanded to the district court. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Douglas B. Shapiro